IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

**DANNY R. ROBERTSON, ET AL.**                                                      **PLAINTIFFS**

**vs.**                                                        **CIVIL ACTION NO. 2:06cv3-KS-MTP**

**J.C. PENNEY COMPANY, INC., ET AL.**
                                                                                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the court on a motion to compel arbitration filed by defendants GE Money Bank ("GE") and J.C. Penney Company, Inc. ("J.C. Penney") and joined in by defendant NCC Business Services ("NCC"). The court, having reviewed the motion, the various responses and replies, all matters made a part of the record of this case as well as applicable law, and having heard oral argument, and thus being fully advised in the premises, finds that the motion is not well taken and should be denied. The court specifically finds as follows:

FACTUAL BACKGROUND

In May 1978 plaintiffs Danny and Gay Robertson opened a credit card account with J.C. Penney. That account was governed by a customer agreement.[1]

In December 1999, plaintiffs' account was acquired by Monogram Credit Card Bank of Georgia ("Monogram").[2] At that time, a notice was sent out to existing credit card customers

---

[1] Neither a copy of this original customer agreement, nor a summary of its terms, has been provided to the court.

[2] Effective February 7, 2005, GE became the successor by merger to Monogram.

1

regarding the transfer of their accounts (the "Notice").  The Notice informed customers that if they made a purchase with their credit card on or after February 14, 2000, a new credit card account would be automatically activated for them, and they would be subject to the terms and conditions of a new customer agreement (the "New Agreement").  The Notice advised customers that if they did not want to accept the terms of the New Account, they could either not make a purchase on their account on or after February 14, 2000, or they could notify Monogram in writing before February 14, 2000 that they rejected the terms of the New Account and were surrendering or destroying their credit card.

The Notice also informed customers that the New Agreement contained an arbitration provision (not contained in customers' existing accounts).  The New Agreement was attached to the Notice.  Paragraph 20 of the New Agreement contains an arbitration provision and it further contains a choice of law provision stating that the New Agreement and New Account would be "governed by and construed in accordance with the laws of the state of Georgia (without regard to internal principles of conflict of laws), and applicable federal law."

Plaintiffs aver in their affidavits that they have no recollection of having received the Notice or the New Agreement, that they did not know that their account was acquired by Monogram and then later GE, and that they were not aware of and did not agree to an arbitration provision with respect to their account.  In response, defendants have produced the Declaration of Martha A. Koehler,[3] who avers that the Notice and New Agreement were sent to plaintiffs.

---

[3] Ms. Koehler is the Manager, Litigation Support for GE Consumer Finance - Americas. In that capacity, she regularly provides research and support assistance for claims and litigation involving GE.  Her responsibilities include regularly accessing GE cardholder records, maintaining and compiling histories of cardholder terms and conditions and investigating account records and transaction histories.  Ms. Koehler avers that because of her position, she is

Attached to her Declaration is a copy of the Notice and New Agreement that were sent to existing customers. In a Supplemental Declaration, Ms. Koehler explained that as of the Robertsons' billing date of November 18, 1999, they had an outstanding balance on their account of $32.09, which was received by the payment due date of December 15, 1999. Ms. Koehler averred that because the Robertsons' account balance was zero, an account statement would not have been generated and they would have been sent the Notice and New Agreement by direct mailing in January 2000, in accordance with the standard operating and mailing procedures in effect at that time.

Plaintiffs made purchases with their credit card after February 14, 2000 - specifically, on April 4, 2001 and thereafter. Ms. Koehler avers that monthly account statements were sent to the Robertsons at their address of record, the same address where the Notice and New Agreement would have been sent.

On October 22, 2004, plaintiffs received a call from GE regarding their account. The representative informed Mr. Robertson that $222.22 was owed on the account. Mr. Robertson paid the entire balance of $222.22 over the phone by debit card, and during that conversation he instructed the representative to close the account. During the next four months, beginning in November 2004, plaintiffs received a call from GE every month saying that they had a balance on their account. Each time, the representative informed plaintiffs that this would be corrected. Nevertheless, GE turned over plaintiff's account to a collection agency, defendant NCC. Plaintiffs then began to receive collection notices from NCC and from other collection agencies.

---

intimately familiar with the manner in which GE maintains credit card account records and account agreements (and Monogram's past practices in his regard).

Plaintiffs also received copies of their credit reports which showed that the account had been charged off as a bad debt.

Plaintiffs filed a complaint in this court on January 4, 2006, asserting claims under the Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDCPA"), as well as state law tort claims. On March 27, 2006, GE and J.C. Penney filed a motion to compel arbitration. NCC joined that motion on August 29, 2006. Oral argument was held on September 6, 2006, and the parties then submitted additional post-hearing briefing.

## ANALYSIS

Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4,[4] provides that where a party has refused to arbitrate under a written arbitration agreement, the other party may petition the court for an order compelling arbitration, and the court shall order the parties to arbitration if it is satisfied that the making of the agreement is not in issue. In resolving a motion to compel, the court must engage in a two-part inquiry: first, it must determine whether the parties agreed to arbitrate the dispute in question, by considering whether there is a valid agreement to arbitrate and whether the dispute in question falls within the scope of that arbitration agreement; and second, it must consider whether legal constraints external to the parties' agreement foreclose

---

[4] The FAA applies to all transactions "involving commerce," which means, *inter alia*, commerce between different states or between a state and a foreign country. *See* 9 U.S.C. §§ 1, 2. Plaintiffs are Mississippi residents. J.C. Penney is incorporated in Delaware and its principal place of business is in Texas. Monogram extended credit to plaintiffs from its principal place of business in Georgia, and GE, which is incorporated in New York, subsequently extended credit to plaintiffs from its principal place of business in Utah. Moreover, "[n]o elaborate explanation is needed to make evident the broad impact of commercial lending on the national economy or Congress' power to regulate that activity pursuant to the Commerce Clause." *Citizens Bank v. Alafabco*, 539 U.S. 52, 58 (2003). The court therefore finds (and none of the parties disagree) that the FAA applies.

arbitration of those claims. *BankOne, N.A. v. Coates*, 125 F.Supp. 2d 819, 827 (S.D. Miss. 2001), *aff'd*, 34 Fed. Appx. 964 (5th Cir. Apr. 5, 2002) (*citing Webb v. Investacorp, Inc.*, 89 F.3d 252, 257 (5th Cir. 1996)).

Did the Parties Agree to Arbitrate the Dispute in Question?

      Is There a Valid Arbitration Agreement?

Plaintiffs argue that they do not recall receiving the Notice or the New Agreement and, therefore, defendants cannot establish that a valid arbitration agreement exists. In response, defendants proffer the affidavits of Ms. Koehler and argue that under the "mailbox rule" plaintiffs are presumed to have received the Notice and New Agreement, and therefore by making purchases after February 14, 2000, they entered into the New Agreement and are subject to its arbitration provision.

"Proof that a letter properly directed was placed in a U.S. post office mail receptacle creates a presumption that it reached its destination in the usual time and was actually received by the person to whom it was addressed." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989); *see also U.S. v. Wilson*, 322 F.3d 353, 362-63 (5th Cir. 2003). Defendants need not prove actual receipt of the Notice or New Agreement; rather, proof of receipt "may be accomplished by presenting circumstantial evidence, including evidence of customary mailing practices used in the sender's business." *Marsh v. First USA Bank, N.A.*, 103 F.Supp. 2d 909, 918 (N.D. Tex. 2000) (*citing Wells Fargo Bus. Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944 (5th Cir. 1983)); *Myer v. Callahan*, 974 F.Supp. 578, 584 n.7 (E.D. Tex. 1997). In addition, the affiant in support of the mailing need not have personal knowledge of the letter's mailing, but "at a minimum the affiant must have personal knowledge of the procedures in place at the time of

mailing." *Burton v. Banta Global Turkey Ltd.*, 170 Fed. Appx. 918, 924 (5th Cir. Mar. 23, 2006) (*citing* FED. R. EVID. 602).

The court finds that the totality of the factual record does not establish that plaintiffs received the Notice or the New Agreement. Indeed, Ms. Koehler's declaration is lacking certain key facts that other courts (including in some of the cases cited by defendants) have found significant in finding that a presumption of receipt had been established. For one thing, Ms. Koehler does not aver that Monogram or GE ever received any returned mail from the Robertsons. *See*, *e.g.*, *Taylor v. First N. Amer. Nat'l Bank*, 325 F.Supp. 2d 1304, 1311 (M.D. Ala. 2004), *motion to amend denied*, 331 F.Supp. 2d 1354 (M.D. Ala. 2004); *Hoefs v. CACV*, 365 F.Supp. 2d 69, 73 (D.Mass. 2005); *Johnson v. Arrow Fin'l Servs., LLC*, 2006 WL 2170663, at * 3 (N.D. Ill. Sept. 15, 2006). In addition, there is no evidence that the Robertsons continued receiving account statements at the same address where the Notice and New Agreement purportedly were sent, and thereafter continued making payments on their account.[5] *See*, *e.g.*, *Battels v. Sears Nat'l Bank*, 365 F.Supp. 2d 1205, 1209 n.3 & 1213 (M.D. Ala. 2005); *Hoefs*, 365 F.Supp. 2d at 73. There has also been no showing that Monogram's or GE's records of plaintiffs' account reflected that the Notice or New Agreement were mailed to them. *See*, *e.g.*, *Taylor*, 325 F.Supp. 2d at 1311; *Kurz v. Chase Manhattan Bank*, 319 F.Supp. 2d 457, 464 (S.D.N.Y. 2004); *Marsh*, 103 F.Supp. 2d at 917. Nor is there extensive discussion of

---

[5] In Ms. Koehler's Supplemental Declaration, she avers that the Robertsons made purchases on and after April 4, 2001, and that monthly account statements were sent to their address of record, the same address where the Notice and New Agreement purportedly were sent. However, she does not indicate that the Robertsons made payments in response to these account statements. Indeed, it is unclear from her declaration and from the Complaint what was going on between December 1999 and October 2004, when the Robertsons received a call from GE that they were delinquent on their account and owed $222.22.

Monogram's or GE's routine business practices regarding the mailing of the Notices, or that any quality assurance controls were utilized to ensure that such procedures were correctly followed. *See*, *e.g.*, *Marsh*, 103 F.Supp. 2d at 916-19.

In addition, the court is not convinced that Ms. Koehler has the requisite personal knowledge to establish that the Notice or New Agreement were mailed to plaintiffs. Ms. Koehler works for GE; however, the Notice and New Agreement were sent by Monogram, of which GE became successor by merger in 2005. It is entirely unclear whether Ms. Koehler worked for GE or for Monogram prior to the merger and, indeed, whether she worked for either entity at the time the Notice and New Agreement were sent out, in December 1999/January 2000. *See*, *e.g.*, *Burton*, 170 Fed. Appx. at 923-24 (rejecting affiant's testimony concerning company's mailing procedures because affiant was not employee of company at time of mailing; *Wilson*, 322 F.3d at 362 (declining to presume that letter was received where witness in support of mailing did not work on the matter and had no personal knowledge of procedures in place at time of mailing). Nor has Ms. Koehler averred that she had personally reviewed the records of plaintiffs' account concerning documents sent to them. *See*, *e.g.*, *Johnson*, 2006 WL 2170663, at * 3.

Accordingly, based on all the facts in the record, the court finds that defendants have not established that plaintiffs received the Notice or New Agreement and, therefore, there is no valid and enforceable arbitration agreement between the parties.

Even if defendants had established that plaintiffs received the Notice and New Agreement, this court would still not find that a valid and enforceable arbitration agreement

among the parties had been formed under Mississippi law.[6]  The Mississippi Supreme Court recently addressed this issue in *Union Planters Bank, Nat'l Ass'n v. Rogers*, 912 So. 2d 116 (Miss. 2005), *reh'g denied* Oct. 20, 2005.  In that case, the Rogerses had accounts with several banks that later merged with Union Planters.  The original signature cards for the accounts did not include agreements to arbitrate.  After the merger, Union Planters sent various notices to its customers indicating that by continuing to use the accounts, the account holders agreed to be bound by an arbitration agreement.  It was undisputed that the Rogerses received the notices and that they continued to use their accounts.  Nevertheless, the court rejected Union Planters' argument that the Rogerses had thereby accepted the terms of the arbitration agreement and were bound by it.  The court explained:

> Submitting to arbitration means giving up the right to file a lawsuit in a court of competent jurisdiction.  Waiving that right requires more than implied consent: Waiver presupposes full knowledge of a right existing, and an intentional surrender of that right.  It contemplates something done designedly or knowingly, which modifies

---

[6] Defendants argue - based on the choice of law provision contained in the New Agreement - that Georgia law applies, rather than Mississippi law.  However, the court agrees with plaintiffs that because defendants have not established that the New Agreement was ever entered into, the choice of law provision contained within the New Agreement does not govern.  Indeed, the cases cited by defendants in support of the proposition that Georgia law applies - *Bank One, N.A. v. Coates*, 125 F.Supp. 2d 819 (S.D. Miss. 2001) and *Overstreet v. Contigroup Cos.*, 462 F.3d 409 (5th Cir.2006) - are inapplicable to the instant case.  In *Overstreet*, the existence and validity of the parties' contract as a whole was not at issue; the issue was whether the arbitration clause contained within that contract was unconscionable.  Thus, the court stated, "[a]s a result, at least for the purposes of our analysis, the validity of the Georgia choice of law provision applicable to the parties' contract has not been called into question. Therefore, we see no reason to disregard the parties' agreement to apply Georgia law to their contract." *Overstreet*, 462 F.3d at 411-12.  And in *Coates*, the original cardmember agreement (that was amended to include an arbitration clause) contained an Ohio choice-of-law provision and there was no challenge to the validity of that agreement.  Thus, "Ohio law...[was] made applicable by the terms of the cardholder agreement." *Coates*, 125 F.Supp. 2d at 825.

> or changes existing rights or varies or changes the terms
> and conditions of a contract. It is the voluntary surrender
> of a right. To establish a waiver, there must be shown an
> act or omission on the part of the one charged with the
> waiver fairly evidencing an intention permanently to
> surrender the right alleged to have been waived.

*Id.* at 119. The court therefore held that because there was no evidence that either of the customers had "voluntarily and knowingly waived" their right to sue in court, the arbitration agreement was unenforceable. *Id.* at 119-20. In so holding, the court expressly rejected the reasoning of courts in other jurisdictions that have upheld implicit waivers of the right of access to the courts, noting that "waiving the right to have access to the courts is something much more significant and of a different character than changing the terms and conditions of a bank account, assent for which can be obtained simply be the continued use of the account." *Id.* at 120.[7] *See also McCreary v. Liberty Nat'l Life*, 6 F.Supp. 2d 920, 920-21 (N.D. Miss. 1998) (denying motion to compel arbitration where plaintiff signed insurance policy application but never signed endorsement containing arbitration provision and therefore "[t]here was no notice, no discussion, and no negotiation of the arbitration endorsement, circumstances, which, in this court's view, hardly signify either agreement or waiver") (*cited with approval in Rogers*, 912 So. 2d at 119).

Similarly, in *Galle v. MBNA Amer. Bank*, 2006 WL 839531, at * 2 (S.D. Miss. Mar.28, 2006), plaintiff opened an account with Hancock Bank, which was subsequently purchased by

---

[7] The *Rogers* court also explicitly rejected the decision in *Herrington v. Union Planters Bank*, 113 F.Supp. 2d 1026 (S.D. Miss. 2000), *aff'd*, 265 F.3d 1059 (5th Cir. 2001), in which District Judge Walter Gex held that plaintiffs were bound by an arbitration clause contained in a revised account agreement, when they continued to use their accounts after receiving notice of the revision, even though they had only signed their initial signature card with the bank (which did not contain the arbitration clause). The court in *Rogers* stated that its "review of arbitration law and contract law leads us to a different conclusion" than in *Herrington*. *Rogers*, 912 So. 2d at 119.

MBNA. MBNA mailed a notice to plaintiff informing him of the purchase and notifying him of changes in the terms of his account, including an arbitration agreement. The notice advised plaintiff that in order to opt out of the arbitration agreement, he would need to contact MBNA in writing. Plaintiff denied receiving the notification from MBNA. Judge Guirola followed *Rogers* and held that because plaintiff did not sign an agreement with MBNA after his account was transferred, there was no evidence that he voluntarily and knowingly waived his right of access to the courts and therefore the arbitration provision was unenforceable. *Id.* at * 2.

Finally, in many of the cases cited by GE and by NCC in support of the motion to compel arbitration, the original agreement being modified to include an arbitration provision contained a provision allowing for the credit card company to modify the terms or conditions of the agreement upon notice to the customer, a fact that the courts found significant in finding that a valid and enforceable arbitration agreement existed. *See*, *e.g.*, *Battels*, 365 F.Supp. 2d at 1207 (original agreement allowed Sears to change any term upon written notice to customer); *Hoefs*, 365 F.Supp. 2d at 71, 73 (clause in original agreement allowed MBNA to amend agreement at any time by complying with notification requirements of federal and Delaware law); *Marsh*, 325 F.Supp. 2d at 1307 (cardmember agreement contained provision allowing bank to change the agreement's terms upon such prior written notice as required by applicable law); *Taylor*, 103 F.Supp. 2d at 915 (cardmember agreement allowed bank to amend its terms at any time upon notice). However, in this case, as noted earlier, the Robertsons' original cardholder agreement has not been presented to the court and therefore there is no evidence that the original agreement

contained a provision allowing modification upon notice to the plaintiffs.[8]

Waiving ones rights to seek redress in a court of competent jurisdiction, which is among our most cherished rights, and submitting yourself to the law of foreign jurisdiction requires more than has been shown by defendants. There must be an unbroken chain of assent from the signatures of the plaintiffs on the agreement providing for changes by assent through the clause requiring arbitration. The defendants have not met their burden.

Accordingly, the court finds that defendants have failed to establish that a valid, enforceable arbitration agreement exists and therefore their motion to compel arbitration must be denied.

IT IS, THEREFORE, ORDERED AND ADJUDGED that defendants' motion to compel arbitration [ **# 10**] is denied..

SO ORDERED and ADJUDGED on this, the 19th day of April, 2007.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE

---

[8] Indeed, even the Georgia statute upon which defendants attempt to rely in arguing that the arbitration provision is valid and enforceable under Georgia law allows a credit card bank to modify the terms and conditions of a credit card account "*as specified in the written agreement governing [the] credit card account*." O.C.G.A. § 7-5-4 ©) (emphasis added).